*Buckham v. Nuss*

**Compliant Exhibit B**

*PTSD and PICS* (5 pages

## PTSD and PICS

Before I start the discussion of what happens to prisoners when they go home and the consequences of post-traumatic stress disorder (PTSD), some clinical definitions of the condition may be necessary. The America Psychological Association defines PTSD as

> the development of characteristic symptoms following exposure to an extreme traumatic stressor involving direct personal experience of an event that involves actual or threatened death or serious injury, or other threat to one's physical integrity.... The characteristic symptoms ... include persistent reexperiencing of the traumatic event ... persistent avoidance of stimuli associated with the trauma and numbing of general responsiveness ... and persistent symptoms of increased arousal. (American Psychological Association, 2000, p. 463)

Another reputable source, *Dorland's Illustrated Medical Dictionary*, defines PTSD as an anxiety disorder caused by exposure to an intensely traumatic event characterized by re-experiencing the traumatic event in recurrent intrusive recollections, nightmares, or flashbacks, by avoidance of trauma-associated stimuli, by generalized numbing of emotional responsiveness, and by hyperalertness and difficulty in sleeping, remembering, or concentrating; the onset of symptoms may be delayed for months to years after the event (Dorland's Illustrated Medical Dictionary, 2000, p. 531).

It was established long ago by the Americans with Disability Act (ADA) that PTSD is a disability and the ADA defines disability as:

> (A) a physical or mental impairment that substantially limits one or more major life activities of such individual;
>
> (B) a record of such impairment; or
>
> (C) being regarded as having such an impairment. (42 U.S.C. 12102(1), 2019; and, 29 C.F.R. 1630.2(j)(1)(iv). (2019)).

Under ADA regulations, a "physical or mental impairment" includes, inter alia, "[a]ny mental or psychological disorder, such as an . . . emotional or mental illness . . ." (29 C.F.R. 1630.2(h), 2019). The ADA is interpreted by courts and government departments, such as the Equal Employment Opportunity Commission, to mean that PTSD is an impairment that substantially limits brain function (Franklin v. Slidell, 2013).

Predictably, PTSD is a common disability among current and former prisoners because of their being subjected to "prolonged, repeated trauma [and] the profound deformations of personality that occur in captivity" (Herman, 1995, p. 115). Even courts have recognized that PTSD is a common disability among prisoners because of the

sustained exposure to violent, degrading conditions (Flynn v. Doyle, 2009). Among current prisoners, this debilitating medical condition can manifest itself at any time and any in any manner. For former prisoners, PTSD can cause life-long psychological disabilities that impair social function and results in recidivism.

For any person who is, or has been, incarcerated there is no effective recourse for a PTSD diagnosis. The Social Security Administration holds that if an impairment has more than a minimal effect on an individual's physical or mental abilities to do basic work activities, it is severe and benefits may be awarded (Social Security Ruling 85-28, 1985). However, current prisoners and most parolees are legally ineligible for social security benefits. The obstacles former prisoners must hurdle to receive benefits in a manner similar to other citizens are immense and deliberately exclusionary. Thus, they suffer the symptoms of PTSD alone and without treatment.

Contemporary psychological research has created a term for PTSD among prisoners. It is called Post-Incarceration Syndrome (PICS) (Liem & Kunst, 2013). PICS is unique to current and former prisoners and is characterized as having very similar psychological and psychosocial problems associated with PTSD in conjunction with other incapacitating symptoms.

In a recent study published in the *International Journal of Law and Psychiatry* conducted by Mariek Liem and Maarten Kunst, the psychological effects of prison were measured in the context of PTSD. The study consisted of in-depth interviews of prisoners who had been released after serving life sentences in Massachusetts. Liem and Kunst found a "cluster of mental health problems" among the former prisoners caused by their incarceration (Id, p. 2). They also found that along with the symptoms of "chronic PTSD, [the] effects of incarceration reported by the interviewees included institutionalized personality traits, social-sensory disorientation and social/temporal alienation" (Id.). In addition to the conventional characteristics of PTSD, the former prisoners were also found to be suffering from sleep deprivation, assiduous evasion of stimuli, and persistent dreams involving negative aspects of the prison experience. And, the former prisoners suffered from hyper-arousal causing problems such as panic attacks.

Significantly, Liem and Kunst found that the institutionalized personality traits that were maladaptive to post-prison life included, mostly, a severe lack of trust coupled with a feeling of paranoia which prevented many of the former prisoners from developing and maintaining meaningful interpersonal relationships. These personality traits – lack of trust and suspicion of others – are among the super-masculinity characteristics prisoners adopt to survive the demands of prison. The paradox is that without being distrustful and suspicious, a prisoner's existence in prison will be epitomized by violence and victimization (conditions that present their own set of traumatic PTSD problems).

Liem and Kunst also found that former prisoners suffered from social-sensory deprivations which were revealed through spatial disorientation (loss of sense of direction in unfamiliar places). A lack of physical closeness and visual contact with other people while in prison contributed to the social-sensory deprivation syndrome to the effect that the former prisoners had trouble accurately reading people's body language and, thus, their true intentions. Among most of the prisoners studied were feelings of alienation – the feeling that they didn't belong in their current environment and that freedom and liberties could change or be taken away at any time. The absence of feeling that one belonged in current social situations contributed to the former prisoners' alienation. The feeling that one does not belong to the community where one resides reduces one's moral and ethical responsibilities to that community – a potentially dangerous scenario that can, and too often does, result in recidivism.

In conclusion, Liem and Kunst recommended the modification of the Diagnostic and Statistical manual of Mental Disorders (DSM-V) to incorporate a new subtype of PTSD and stress-related disorder specifically for prisoners. This is a significant recommendation as the DSM-V is the world's authority in defining and diagnosing mental disorders. The researchers also suggested that people who meet the diagnostic criteria for PTSD in the DSM-V, as most current and former prisoners do, should be evaluated for symptoms associated with PICS-type institutionalized personality traits resulting from incarceration, social-sensory deprivation syndrome, and social alienation (Id., p. 4).

As the researchers correctly pointed out, accurately diagnosing PTSD and PICS in current and former prisoners will help them receive appropriate treatment and increase their chances of successful reentry into the community which will result in reduced recidivism and community victimization.

Other research studies conducted with former prisoners established that some of the most profound and debilitating psychological consequences of incarceration only begin to manifest after release. The reason that the problems do not become apparent until after release is a consequence of the super-masculinity characteristic where displaying emotions and feelings is considered a sign of weakness and an invitation for victimization. These debilitating consequences include "marked features of estrangement, loss of sense of purpose and direction" along with "a pervasive attitude of mistrust towards the world" (Grounds, 2005, p. 15).

Another researcher, Michael Massoglia, studied how the psychological consequences of incarceration of a released prisoner affected a prisoner's family. It is the only study of its kind that I am aware of. Massoglia concluded that the "psychological consequences of imprisonment for those men and their families were complex and profound" (Massoglia, 2008, p. 295). These findings cannot be ignored or discounted. In addition to the psychological consequences of incarceration, Massoglia

also found that former prisoners have heightened risks of physiological medical problems compared to citizens who have not been incarcerated, such as higher instances of contagious and deadly diseases, which can have life-long (and life-ending) consequences that are "further barriers to the successful reintegration of offender" (Id.)

One very disturbing study found that in the first two weeks after release from prison the mortality rate for released prisoners was twelve times higher than the general population and two years after release the mortality rate was three and one half times higher (Binswanger, Stern, Deyo, & Heagerty, 2007). When I first learned of the twelve times higher statistic I immediately assumed that it was due to newly released prisoners' inability to keep-up with the fast pace of society. In particular, I pictured someone accidentally stepping off a sidewalk or getting into a vehicle accident. I was wrong. The leading cause of death for newly released prisoners is suicide followed by homicide, drug overdose, and heart attack. I've never been released from prison so I can't speak directly about the problems faced by those have been but I sincerely hope that prison has not damaged my will to live to the point where suicide becomes a viable solution to life's obstacles. Sadly, this has not been the case for everyone.

If imposing the severe disabilities associated with PTSD and PICS are what legislators and prosecutors have in mind when they send people to prison, then prisoners should have no reason to complain about the conditions as they have been inflicted with malice, deliberately aforethought. However, I am an optimist and I sincerely hope that inflicting life-long psychological injury is not what sane legislators or the public want as a punishment for violating statutes.

Cristopher Buckham
Coalition for Wyoming Justice Reform
cbuckham112@gmail.com
Follow Cristopher_Buckham on Facebook

### References
29 C.F.R. 1630.2(h). (2019). Physical impairment.
42 U.S.C. 12102(1). (2019). Definition of disability. See also 29 C.F.R. 1630.2(g)(2) ("An individual may establish coverage under any one or more of these three prongs of the definition of disability . . . "); and, 29 C.F.R. 1630.2(j)(1)(iv). (2019). ("The determination of whether an impairment substantially limits a major life activity requires an individualized assessment.")
American Psychological Association. (2000). *Diagnostic and Statistical Manual of Mental Disorders*, 4th Edition. Washington, DC: Author.

Binswanger, I. A., Stern, M. F., Deyo, R. A., & Heagerty, P. J. (2007). Release from prison – A high risk of death for former inmates. *New England Journal of Medicine, 356,* 157-165.

*Dorland's Illustrated Medical Dictionary,* 29th Edition. (2000). Philadelphia, PA: Saunders.

*Flynn v. Doyle.* (2009). 672 F. Supp 858, 866 (E.D. WI).

*Franklin v. Slidell.* (2013). 936 F. Supp. 2d 691 (E.D. LA).

Grounds, A. (2005). Understanding the effects of wrongful imprisonment. *Crime & Justice, 32,* 1.

Herman, J. (1995). A new diagnosis. In J. Herman (Ed.), *Trauma and recovery.* New York, NY: Basic Books.

Liem, M., & Kunst, M. (2013). Is there a recognizable post-incarceration syndrome among released "lifers"? *International Journal of Law and Psychiatry 36*(3-4), 333-339. Retrieved from http://dx.doi.org/10.1016/j.ijlp.2013.04.012

Massoglia, M. (2008). Incarceration, health, and racial disparities in health. *Law & Society Review, 42,* 275. Retrieved from https://doi.org/10.1111/j.1540.5893.2008.00342.x

Social Security Ruling 85-28. (1985). SSR LEXIS 19, *8.